NATTERSTAD v. TITLE GUARANTEE & TRUST CO. et al.

(District Court, D. Oregon. June 8, 1918.)

1. TRUSTS ⬦325—ACCOUNTING—EVIDENCE.
      In a suit for an accounting, where complainant had conveyed property to defendant pursuant to a trust agreement, *held*, under the evidence, that the account stood balanced; the only advances made by defendant having been repaid, and defendant having received no rents, etc., from the property.

2. VENDOR AND PURCHASER ⬦44—OPTION—EXTENSION—SIGNING.
      Evidence *held* to show that complainant signed certain indorsements on an option to purchase, extending the time within which it might be exercised.

3. TRUSTS ⬦61(3)—EXISTENCE OF TRUST—TERMINATION—EXECUTION OF RELEASE.
      In a suit against the trustee, to whom complainant had conveyed property after giving an option thereon to a third person, evidence *held* to show that complainant of her own free will signed a release in favor of the trustee, which conveyed to her a portion of the property, and that she quitclaimed the remainder, thus terminating the trust.

4. MORTGAGES ⬦294—EQUITY OF REDEMPTION—CONVEYANCE.
      While the rule is that, once a mortgage, always a mortgage, and that the relationship continues until discharged, the mortgagor, after execution of the instrument, may convey to the mortgagee his equity of redemption.

In Equity. Bill by Jennie C. Natterstad against the Title Guarantee & Trust Company and R. S. Howard, as receiver. Bill dismissed.

James E. Fenton, of Portland, Or., for complainant.
Wm. C. Bristol, of Portland, Or., for defendants.

WOLVERTON, District Judge. The bill of complaint sets forth, in effect, that the complainant Natterstad (formerly Jennie C. Kingsboro), entered into an agreement with the Title Guarantee & Trust Company on March 18, 1905, whereby the Trust Company agreed to advance to her upon her order divers sums of money, and to assume the payment in her behalf and on her account of certain indebtedness, etc.; the complainant agreeing to convey by deed to the Trust Company certain property that she owned, including certain timber lands and some lands located near a stream, which are called boom lands, and also the boom privileges and certain stock in the Boom Company.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It is also alleged that the Trust Company was to receive certain rents and profits from the operation of the boom property, and was to account to complainant therefor. In accordance with the terms of the agreement, two certain deeds were made, and this property, consist-ing of the real estate and the boom property and this personal prop-erty, 25 shares of stock in the Boom Company, was transferred to the Trust Company. It is further alleged that the Trust Company, in accordance with the deed and the trust agreement, advanced to the complainant money in about the sum of $8,000, but that thereafter it derived large sums of money from the operation of the boom prop-erty, which exceeded the sum advanced to complainant. Complain-ant seeks an accounting as to these rents and profits—first, to have them offset against the advances which she alleges the Trust Company made to her; and, second, a decree for such balance as may be found to be due her.

The answer admits the execution of the agreement and the convey-ance of the property thereunder, but alleges in effect that the Trust Company has complied with all the terms of the agreement, and has been fully released and discharged by complainant of all further duties and obligations thereunder. In relation to the release, a con-troversy has arisen as to whether it was obtained through duress and fraud, and it is further asserted that a certain quitclaim deed from complainant, executed at the time, is a forgery. The parties have been heard on all these issues, notwithstanding certain objections that the pleadings do not admit of so broad an inquiry.

The agreement provides, among other things, after stating that the conveyance of the property shall be made, that the property so con-veyed is to be held by the Trust Company for the following uses and purposes, to wit:

"(1) To secure unto the said Trust Company the repayment of the sums which may be advanced or which may become due to it, including interest, for or on account of said property, or any part thereof, or for or on account of any of the terms and conditions of this agreement.

"(2) Subject to the foregoing for Jennie C. Kingsboro and subject to her written instructions. It is further understood and agreed that said Trust Company assumes no manner of liability for or on account of the care or custody of said property or for the payment of taxes or public charges there-on or for the validity of the title to said premises or depreciation of the value of the same, but it is understood and agreed that it shall be recompensed out of the property, with interest, for any expenses which may be necessarily in-curred on its account."

The two deeds were executed simultaneously with the execution of this agreement. One of them, however, bears date the 17th of March, instead of the 18th. The trust agreement (I am calling the paper a trust agreement for the purpose of a short designation thereof) was executed on March 18, 1905. On March 17, 1905, the complainant gave to one Lincoln R. Ferbrache an option to purchase all the prop-erty that was conveyed by the two deeds. This is a day previous, now, to the time when the trust agreement was entered into and one of the deeds was made, but contemporaneously with the date and time of the execution of the other deed.

The consideration named in the option for the 140 acres of land and the boom rights and privileges is the sum of $10,000. Then there was an additional option given by the same paper to purchase 200 acres of land, which is denominated the timber land. So that the option itself is really double, giving the right to Ferbrache to purchase the 140 acres and the boom property for $10,000, and also the 200 acres, being the timber land, for $15,000. This option was to be exercised within 30 days. There is no question as to the validity of the option, because it is admitted to have been signed by complainant and executed for the purposes therein indicated.

On March 23, 1905, the Trust Company opened an account with J. C. Kingsboro Trust. This is evidenced by the account, which was offered in evidence by defendants and is marked Defendants' Exhibit K. This was the situation before further transactions were had between the parties; the Trust Company being the holder of the title to the property conveyed to it by complainant, to do with it as the trust agreement and the complainant directed.

[1] I will first dispose of the claim that the Trust Company advanced to the complainant $8,000, or thereabouts. Complainant relates that the Trust Company advanced to her three sums of money, and no more, as follows: On April 22, 1905, $4,220; in July—June or July, I did not get the date exactly—another sum of $2,000; and in April, 1906, $1,139, making a total of $7,359. The evidence conclusively shows that the first amount of $4,220 was paid into the Trust Company bank by Ferbrache to her account, and afterwards drawn out by her by check. This is shown by Defendants' Exhibit L, which is the deposit tag, and Plaintiff's Exhibits 4 and 5, pages in complainant's passbook. So that this sum was not an advancement to her by the Trust Company, but a payment made to her by Ferbrache. The $2,000 was also paid to her by Ferbrache. For this purpose Ferbrache procured from the Trust Bank a certified check for that amount, and paid it to her in that form. This is evidenced by Defendants' Exhibits H and N. Exhibit H is a receipt given by complainant to Ferbrache himself, acknowledging receipt of the $2,000 from him; and Exhibit N is a tag showing that Ferbrache was charged by the bank with a certified check in amount equal thereto. So that this sum did not constitute money advanced to the complainant by the Trust Company.

The next and last amount, namely, $1,139, was really advanced to complainant's account by the Trust Company in settlement of a certain claim that one Henry Teller made on account of the bond for a deed mentioned in the trust agreement and one of the deeds. The Kingsboro Trust account shows that complainant received a credit on April 30th, "Check favor Henry Teller for settlement per order her attorney," $1,139. So that was really an advance by the Trust Company to her. The letter from Spencer & Davis to the Trust Company also evidences the intent on the part of the Trust Company to make this advance, and no doubt the advance was made in accordance therewith. But this amount was repaid to the Trust Company by complainant, with other charges representing the balance due on the Kingsboro Trust account, March 23, 1907. A receipt given to Jennie

C. Natterstad by the Trust Company is so dated, but the item was entered in the Kingsboro Trust account March 26th. That receipt and the item in the account show that she paid to the Trust Company $1,220.98, which balanced her account with it. In the end, therefore, there was nothing left of any advances made by the Trust Company to the complainant.

As to the rents and profits from the boom property, the evidence shows that the Trust Company never leased the property and never operated it, and consequently received no money from that source to the credit of complainant. The testimony on the part of the Trust Company, and also the testimony of Mr. Holden, who was a witness for complainant, is to the effect that whatever operation of the boom property took place was directed by Mr. Ferbrache, and not by the Trust Company. The Trust Company never went into possession. The only possession taken was by Ferbrache, and he continued to operate it, either for himself or for the Boom Company, which was afterwards organized. So that there were no rents and profits received whatever by the Trust Company from any source to the credit of the complainant here. As it respects the money account, therefore, the complainant owes the Trust Company nothing, and the Trust Company owes the complainant nothing, and the account stands at balance.

[2] Now, as to the property held under the trust agreement: By reference to an indorsement on the option, it will be seen that complainant bound herself to convey to Ferbrache 140 acres of land, with the boom rights, within 90 days from the date of the indorsement, April 19, 1905. The option itself was to mature in 30 days, and this indorsement manifestly was for the purpose of extending it. Mrs. Natterstad denies that she signed this extension. However, she is undoubtedly mistaken about that. The writing is in her hand without question, and one of the subscribing witnesses to the indorsement was here in court, and recognized her signature, and testified that she signed it. So I think that her declaration that she did not sign it is overbalanced by the testimony to the contrary. There is another indorsement on the same instrument, bearing date April 19, 1905, which reads:

"In consideration of the purchase of the property above described and the further sum of $1 in hand paid to me by Lincoln R. Ferbrache, the option of purchasing the timber lands described on the opposite side of this sheet is hereby extended."

[3, 4] The same testimony applies to this indorsement, and the court is of the opinion that she signed it also. It appears, however, that there was nothing else done particularly about these matters for a considerable length of time. They seem to have run along until March 25, 1907, when the complainant executed a release to the Trust Company. I will read that release, because much depends upon it:

"I hereby acknowledge receipt of a deed to the northeast quarter and the southeast quarter of the northwest quarter of section 28, in township 11 north, of range 7 west of the Willamette meridian, from you to myself; and I hereby authorize and direct you to deed the remainder of the property cov-

ered by the attached certificate, and known as the 'boom property,' a quitclaim deed to which I hand you herewith, to whomsoever L. R. Ferbrache may direct, subject, however, to the Holden mortgage of $800. I hereby acknowledge that the Title Guarantee & Trust Company has carried out and complied with all of the terms and conditions of this trust, and has accounted to me for all funds and property pertaining thereto, and I hereby release said company from said trust."

Mrs. Natterstad admits the signing of this instrument. She says that it is her signature appended thereto; but she indicates, by innuendo rather than by positive statement, that the instrument itself was procured through duress and fraud. She has testified at some length why she says that, and couples with the transaction the name of Mr. Spencer. The quitclaim deed, which is referred to in the release as having been made at that time, she positively denies that she executed; but in this I am sure she is also mistaken, because not only Mr. Spencer himself, who is a subscribing witness to the deed, says that she executed it—he was not certain as to the place where—but W. E. Farrell, the other attesting witness, says the same, and that it was executed in the office of Spencer & Davis. He remembers it very distinctly, because, he says, he wrote the deed, calling attention to the red lines, which were a matter in which he took some pride in drawing the instrument, and recognizes it fully as being the deed that he drafted. He remembers, also, that Mrs. Natterstad signed the deed, and Spencer says it was duly acknowledged before him. Mrs. Natterstad asserts that what was done in that regard, if anything, was done at her then place of residence; but Farrell denies this, and says the deed was executed at the office of Spencer & Davis. I am induced to believe Mr. Spencer and Mr. Farrell as to the execution of that deed. There is no doubt in my mind that complainant executed it, and she in all probability knew why she was executing it. From a careful consideration of all the testimony, I am firmly persuaded that she executed it of her own free will, knowing altogether what she was doing, and unreservedly intended to do just what the papers indicate was done.

Now, then, there were 200 acres of land that were deeded to her. About this there is no contest, and of course that fulfills the conditions of the trust agreement itself, so far as that acreage is concerned. The land was simply deeded back to her, which discharged that amount of the property from all trust relations whatsoever. At the foot of the release is a direction by Ferbrache to the Title Guarantee & Trust Company to deed the property mentioned therein, known as the boom property, to the Seal River Boom Company, a Washington corporation. It is not controverted here at all that the Trust Company did deed all the property save the 200 acres, to the Boom Company, thereby complying with the direction of Ferbrache, which direction was authorized by the release executed by Mrs. Natterstad. Defendants' Exhibit D is not only evidentiary thereof, but it shows a settlement of the affair between Mrs. Natterstad and Ferbrache.

This, then, is in effect the culmination of the affairs existing between complainant and the Trust Company. The Trust Company has complied, according to her own release, and according to what is ad-

mitted here, in all respects with its trust undertaking, and has fulfilled in all respects the obligations that it took upon itself by entering into this trust agreement. This was all done before the Title Guarantee & Trust Company went into the receiver's hands. The receiver himself took nothing whatever from the Trust Company of this trust property; he assumed no obligations under the trust agreement, because that agreement had, prior to the appointment of any receiver, been entirely fulfilled and discharged; so that there is no present obligation on his part to be observed, either for a money accounting or for a return of any property.

Much has been said about the law of the case, and the principle, "Once a mortgage, always a mortgage," has been invoked. The principle is very well settled that, when parties have entered into an agreement whereby the instrument made and executed is to be deemed a mortgage, the instrument continues to be a mortgage until the relationship is discharged. A mortgagor may discharge the mortgage by a conveyance of the equity of redemption to the mortgagee. I think in this case the agreement was not a mortgage. It was a trust agreement, pure and simple, for the convenience of the parties, and more especially for the convenience of Mrs. Natterstad. For some reason she did not want her property to stand in her name at that time. She was entering into this arrangement with Ferbrache for the purchase by him of her property, and it seemed to be convenient that this trust agreement be made with the Trust Company, so that the property might be put out of her hands and held by the Trust Company in the meantime until her obligation under the option with Ferbrache to sell to him was discharged. The matter was carried through upon that basis, and under the idea that this was a trust arrangement, and not a mortgage. But, if it were a mortgage, the equity of redemption was conveyed by Mrs. Natterstad to the Trust Company by this deed, made on the day that she executed the release, and the mortgage relationship thereafter could not and did not exist.

So the right to demand an accounting is not apparent in the present case, either for money had and received or for other property, and the bill of complaint will therefore be dismissed.